Michael Zoldan; AZ Bar No. 028128
**CHELLE & ZOLDAN, PLC**
7400 E. Pinnacle Peak Rd.
Suite 204
Scottsdale, AZ 85255
Tel & Fax: 480.442.3410
MZoldan@Chelle-Zoldan.com
Docketing@Chelle-Zoldan.com

Attorneys for Plaintiff
John Crismon

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| **John Crismon**, an Arizona Resident,<br><br>Plaintiff,<br><br>v.<br><br>**Rural/Metro Corporation**, an Arizona Corporation; **IAFF Local 3878 Charities**, an Arizona Non-profit Corporation,<br><br>Defendants. | **Case No.**<br><br><br><br>**VERIFIED COMPLAINT**<br><br>**(Jury Trial Demanded)** |

Plaintiff John Crismon ("**Crismon**"), for his Verified Complaint against Defendants Rural Metro Corporation ("**Rural Metro**" or the "**Company**") and IAFF Local 3878 Charities (the "**Union**"), hereby alleges as follows:

## PARTIES

1.    Plaintiff Crismon is, and at all times relevant hereto was, a resident of Maricopa County, Arizona.

2.    Plaintiff was, at all times relevant to this Complaint, an employee of Rural Metro.

CHELLE & ZOLDAN, PLC
7400 East Pinnacle Peak Rd. Suite 204 Scottsdale, AZ 85255
Tel & Fax: 480.442.3410 – Docketing@Chelle-Zoldan.com

3.     Plaintiff was, at all times relevant to this Complaint, a member of the Union in good standing.

4.     Upon information and belief, Defendant Rural Metro is an Arizona corporation, organized and existing under the laws of the State of Arizona.

5.     Upon information and belief, the Union is an Arizona Non-profit corporation, organized and existing under the laws of the State of Arizona.

6.     According to the Union's Constitution and Bylaws, it is charged with representing the needs of its members collectively and individually in matters dealing with their jobs, including safety, training, working conditions, wages, and a healthy working environment.

7.     The Union is a labor organization representing employees in an industry affecting commerce and is bound by the acts of its agents and may be sued in this Court. *See* 29 U.S.C. § 185(a)-(b).

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question.

9.     This Court has original jurisdiction over the parties and subject matter set forth in this Complaint pursuant to 29 U.S.C. § 185 *et seq.*

10.    This Court has supplemental jurisdiction over Plaintiff's state law claims because they are so related to the claims in the action having original jurisdiction that they form part of the same case or controversy pursuant to 28 U.S.C. § 1367(a).

11.    The employment practices alleged to be unlawful were committed within, and had their primary effect in, the jurisdiction of the United States District Court for the

CHELLE & ZOLDAN, PLC

7400 East Pinnacle Peak Rd., Suite 204 Scottsdale, AZ 85255
Tel & Fax: 480.442.3410 – Docketing@Chelle-Zoldan.com

District of Arizona.

12.     Crismon has exhausted all required internal grievance procedures that are, or may be, a pre-requisite to filing suit with this Court.

13.     An employee need not exhaust grievance and arbitration procedures established by a collective bargaining agreement ("**CBA**") prior to bringing suit for breach of agreement if the employer repudiates those contractual procedures or if the union breaches its duty of fair representation.

## FACTUAL ALLEGATIONS

14.     Crismon commenced employment with Rural Metro in or around February of 2002 as a firefighter.

15.     After exhibiting impressive leadership capability and earning a stellar reputation among his supervisors and peers, Crismon was promoted to Lieutenant in 2008 and then to Captain in 2009.

16.     Throughout the first decade of his employment, Crismon consistently received excellent performance reviews and earned numerous accolades, awards, and recognitions for his impeccable service as a Rural Metro employee.   The following represents a non-exhaustive list of Crismon's many praises during his employment with the Company (and membership with the Union):

    a.    Crismon graduated at the top of his Firefighter Academy class in 2002, earning the prestigious Valedictorian distinction;

    b.    Crismon graduated at the top of his class, with honors, from the Paramedic Academy;

    c.    Crismon was chosen among his peers (approximately 200 employees/Union members) to serve as "Acting Captain" for a period of one year.  As the Acting Captain, Crismon was responsible for running a crew and fire station in Litchfield Park, Arizona;

CHELLE & ZOLDAN, PLC
7440 East Pinnacle Peak Rd., Suite 204 Scottsdale, AZ 85255
Tel & Fax: 480.442.3410 – Docketing@Chelle-Zoldan.com

CHELLE & ZOLDAN, PLC

7400 East Pinnacle Peak Rd. Suite 204 Scottsdale, AZ 85255
Tel & Fax: 480.442.3410 – Docketing@Chelle-Zoldan.com

d.   Crismon cofounded a Non-profit organization called Hometown Heroes, which delivers valuable safety messages every month to over 5,000 children Valley wide;

e.   Crismon founded the San Tan Valley Public Safety Coalition and was featured in the San Tan local newspapers for his exemplary service as a firefighter;

f.   Crismon was chosen by Rural Metro to become an assistant PIO;

g.   Crismon was featured in the local San Tan Valley newspaper for saving the life of a three year old boy who accidentally shot himself in the head; and

h.   Crismon was featured on various news television programs for donating and delivering toys to children at Phoenix Children's Hospital.

17.   On or around February 5, 2012, Crismon and members of his crew witnessed Captain George Drum ("**Drum**") stealing medical supplies from Rural Metro Fire Station 842 in Pinal County.

18.   Such medical supplies include, *inter alia*, Dextrose (a DHS controlled substance), IV kits, saline bags, needles, and Select III tubing.

19.   Theft of Company property is against Rural Metro policy, including, but not limited to the Company's Code of Ethics and Business Conduct (General Compliance Policy).

20.   Theft is listed as an "Intolerable Violation" under the CBA, Article C (d).

21.   Rural Metro employees are expected to report all suspected violations of the Company's General Compliance Policy.

22.   Consistent with his duties under Rural Metro policy, Crismon reported Drum's suspicious activity to his supervisor, Battalion Chief, Peter Zick ("**Zick**").

23.   As a result of Crismon's report, Drum was placed under investigation for

theft.

24.    After admitting to the theft, Drum was demoted (instead of being terminated) from the Captain position to the rank of firefighter.

25.    Several of Crismon's peers (all of whom are members of the Union) perceived his report as an act of disloyalty to the other crews, captains, and firefighters— and by extension the Union.   Many firefighters openly voiced their disapproval of Crismon's disclosure directly to him.

26.    Indeed, throughout the course of 2012, Crismon and his crew were constantly referred to as "rats" and "brother fuckers" by fellow Union members.   The same Union members remarked that they would not "piss" on Crismon and his crew if they were on fire.

27.    For the remainder of the year following Crismon's February 2012 disclosure, Crismon and his crew experienced increasingly severe reprisal from peers, subordinate members of other fire crews, and Union Trustees.   As a result, the department quickly became polarized into Union members who despised Crismon and those who sympathized with Crismon and his crew.

28.    Immediately after Crismon's February 5, 2012 disclosure, he was approached by Captain Houston Greer ("**Greer**"), and subjected to interrogation regarding the events that generated Crismon's report.   Greer berated Crismon for reporting Drum, reflecting the malevolence circulating through the Union against Crismon.

29.    In addition to being a Captain, Greer is also a Union Trustee, which is a position of authority and popularity within the Union as it can only be achieved by vote.

CHELLE & ZOLDAN, PLC

7400 East Pinnacle Peak Rd. Suite 204 Scottsdale, AZ 85255
Tel & Fax: 480.442.3410 – Docketing@Chelle-Zoldan.com

CHELLE & ZOLDAN, PLC

7400 East Pinnacle Peak Rd. Suite 204 Scottsdale, AZ 85255
Tel & Fax: 480.442.3410 – Docketing@Chelle-Zoldan.com

30.     Greer further informed Crismon that the Union was conducting its own investigation into Crismon's disclosure.

31.     In early March 2012, in retaliation for his disclosure about Drum, Greer spearheaded another Union investigation against Crismon, this time regarding unsubstantiated allegations that Crismon interfered with a firefighter's ability to procure employment with Crismon's former employer, Banner Ironwood Medical Center.  Greer alleged that Crismon contacted his former manager at Banner and disparaged the Rural Metro prospect's name.

32.     Crismon denied Greer's allegations and further requested that the Company cure his intolerable work environment, as Greer's most recent allegations were yet another desperate attempt to cause harm to Crismon.

33.     Neither the Company nor the Union provided a remedy to Crismon's complaint.

34.     Greer later generated more rumors that Crismon secured his previous employment at Banner by maintaining a sexual relationship with his supervisor.  Crismon, once again, reported this nonsense to Zick, seeking a reasonable resolution.

35.     Much like his responses to Crismon's previous complaints, Zick was silent.

36.     On or about March 22, 2012, Crismon submitted another complaint to Zick, in writing, enumerating several incidents of harassment to which he believed deserved Company attention.

37.     In this complaint, Crismon disclosed the rumors about other crews adopting the idea that they would not save Crismon or his crew if they were trapped in a fire.  Crismon specifically mentioned that he was concerned by the implications of these types

of statements while responding to a fire.

38.     Also in the complaint, Crismon informed Zick that his par tags were displaced from their traditional location and replaced by Drum's, which were not typically displayed in that same area.  Crismon indicated that his par tags were not recovered.

39.     Crismon also informed Zick that his personal EMS clipboard had been displaced from its normal location and damaged so that it was no longer functional.

40.     Zick did not respond to Crismon's March 22, 2012 complaint.

41.     The Company did not respond to Crismon's March 22, 2012 complaint.

42.     The Union did not respond to Crismon's March 22, 2012 complaint.

43.     In or around May 2012, an "anonymous" complaint was submitted accusing Crismon of using a fire helmet camera to spy on other crews in an attempt to catch them committing a policy violation.  The "anonymous" complaint also protested Crismon's repeated submission of reports against employees and Union members for violating Company policies.

44.     Upon information and belief, the "anonymous" complaint was generated by either Greer or Captain Andy Robinson ("**Robinson**").

45.     Akin to the all prior complaints against Crismon, the "anonymous" complaint was found to be without merit.

46.     Consistent with Crismon's increasingly hostile work environment, Union Trustee and Captain Brian Gilbert ("**Gilbert**"), behaved unprofessionally towards Crismon on the scene of a structure fire.  As the altercation occurred and was transmitted over the Company's radio, Chief Chuck Fitzgerald facilitated a closed-door meeting in an

CHELLE & ZOLDAN, PLC

7400 East Pinnacle Peak Rd., Suite 204 Scottsdale, AZ 85255
Tel & Fax: 480.442.3410 – Docketing@Chelle-Zoldan.com

attempt to quell any hostility between the two.  To Crismon's detriment, Fitzgerald's attempt was unsuccessful.

47.    On June 6, 2012, Rural Metro scheduled a meeting with Crismon, his crew, and the Company's Human Resources Department.

48.    Ostensibly the purpose of the meeting was to inform Crismon and his crew that the Company was considering transferring Drum from a different station back to Crismon's station.

49.    In response, Crismon and his crew expressed their concerns that placing Drum in their station would only exemplify the atmosphere of harassment.  They reiterated specific examples of such harassment and expressed their fears of future retaliation if the Company allowed Drum's transfer.

50.    The Company ignored Crismon's emphatic insistence that Drum not return to his station.

51.    After learning that Drum was returning to his station, Crismon attempted to reconcile with Drum in order to preemptively address what he feared would result in an even more unbearable work environment upon Drum's return.

52.    At the meeting, Drum accused Crismon of stealing Company property by providing a prescription drug, Zofran, to members of Drum's crew.

53.    Indeed, Drum was accusing Crismon of doing almost the exact same thing that Crismon reported Drum of doing almost five months prior.  Drum further accused Crismon of generating a hostile work environment for him.

54.    On July 17, 2012, after his meeting with Drum, Crismon drafted a detailed complaint to Zick expressing his concerns about Drum's allegations made throughout

CHELLE & ZOLDAN, PLC

7400 East Pinnacle Peak Rd. Suite 204 Scottsdale, AZ 85255
Tel & Fax: 480.442.3410 – Docketing@Chelle.Zoldan.com

their meeting. Crismon specifically stated that he believed Drum's false allegation was retaliatory and requested that the Company remedy his intolerable work environment that Drum's presence at the station would no doubt exacerbate.

55. Notwithstanding this complaint, Drum was still permitted to return to Crismon's station and neither Zick, the Union, nor the Company took any action to remedy or even address Crismon's hostile work environment and retaliation complaints.

56. Upon information and belief, despite the Company's policy prohibiting theft of its property, Drum's demotion was reversed as a result of Rural Metro's finding that other Company employees stole similar prohibited materials and were not demoted or terminated.

57. Following Drum's reinstatement as Captain, he immediately began to disparage Crismon and his crew.

58. In an obvious attempt to mock Crismon and his crew, Drum remarked to a group of Company employees/Union members that he was going to report each person who drank from a Company water bottle for theft. Crismon reported these remarks to Zick, along with several other similar remarks made by Drum.

59. Zick also received reports that Crismon and his crew were being called "rats" and "brother fuckers," among other threats that they would get their come-uppance.

60. Despite having actual knowledge of Crismon's intolerable work environment, Zick, the Union, and the Company did nothing to remedy such harassment.

61. Additionally, other crews warned Crismon that some crews that were loyal to the Union made comments that they would not save Crismon or his crew if they were

CHELLE & ZOLDAN, PLC

7400 East Pinnacle Peak Rd. Suite 204 Scottsdale, AZ 85255
Tel & Fax: 480.442.3410 – Docketing@Chelle-Zoldan.com

CHELLE & ZOLDAN, PLC

7400 East Pinnacle Peak Rd., Suite 204 Scottsdale, AZ 85255
Tel & Fax: 480.442.3410 – Docketing@Chelle-Zoldan.com

dying in a fire, and likewise would not "piss" on them if they were in a fire.  Given the very real and immediate dangers that accompany firefighting, this was very disturbing to Crismon and his crew.

62.     Another example of harassment occurred when Crismon experienced a malfunction while reporting to a structure fire.  While in the interior of a residence, his mask stopped providing air for approximately one to two seconds.  He immediately checked his pack several times, inspected the mask, and could not replicate the failure.

63.     Crismon reported the incident to the appropriate employees, including Robinson.

64.     After criticizing Crismon's actions in response to the equipment failure, and consulting with Greer, Robinson posted on a Company-wide forum that Crismon had improperly handled the situation.  Traditionally, these "near misses" are posted without identifying the firefighter involved in order to protect their identity.  Robinson, however, specifically named Crismon.

65.     In response to Robinson's conduct, Crismon informed his supervisor of the situation, requesting that he handle his concerns appropriately while specifically mentioning that the situation created a hostile work environment.

66.     On or around August 2012, Crismon reported the Southwest Ambulance Crew for a policy violation.  Once again, he was subjected to unwarranted harassment from his peers for executing his duties under Rural Metro policy.

67.     On August 29, 2012, Crismon worked a regular shift at his station with firefighters Dustin Lantz and engineer Jason Whelan.  At the conclusion of the shift, after clocking out, Lantz requested to see Crismon's newly modified firearm.

68.    As Crismon kept the firearm in his vehicle, which was not parked on Company property, Crismon and Lantz left Company premises to view the unloaded gun at Crismon's car.

69.    A few weeks later, rumors began to surface that Crismon had displayed his firearm on Company property, in the station itself.

70.    These allegations are false, and were unequivocally denied by Crismon at all relevant times to both the Union and the Company.

71.    Approximately a month after Crismon showed his firearm to Lantz, Greer approached Crismon and demanded that he immediately self-report the incident to the Company, on speaker phone in his presence, which Crismon did.

72.    Prior to approaching Crismon, Greer and other Union representatives surreptitiously initiated an investigation of their own and warned Lantz and Whelan not to speak with Crismon regarding the incident during the Union's secret investigation.

73.    Crismon was unaware of the Union's covert investigation, which lasted approximately two days, until he was approached by Greer and instructed to self-report.

74.    Based at least in part on Crismon's self-report, the Company launched an investigation into the firearm incident.

75.    On or about September 10, 2012, Crismon was also investigated for an Anti-Kick Back Trust violation.  Another "anonymous" complaint alleged that Crismon directed ambulances to Banner and was compensated for it.    Throughout this investigation, Crismon informed the Company that these unsubstantiated allegations were generated with a retaliatory motive.  In addition, as a result of the complaint, the Southwest Ambulance Local Union I60 also performed an investigation into Crismon's

alleged impropriety by telephonically interviewing numerous Rural Metro employees.

76.   Upon information and belief, the Southwest Ambulance Local Union deemed the allegations against Crismon unsubstantiated.

77.   Likewise, the Company deemed the Anti-Kick Back complaint as unsubstantiated.

78.   On or about October 5, 2012, at the conclusion of the Company's investigation regarding the firearm incident, Crismon was issued a Corrective Action Notice ("**CAN**").

79.   Crismon was given a final warning and a two shift suspension for allegedly showing a firearm to another employee while in his personal vehicle on company premises.

80.   Crismon signed the CAN and served his two shift suspension, while maintaining to Zick and Company Human Resources personnel that he did not show his firearm to Lantz on Company premises, consistent with his self-report a month prior.

81.   Upon information and belief, the Company based its October 5, 2012 decision to discipline Crismon upon some combination of (1) Crismon's self-report; (2) an October 3, 2012 written statement of Jason Whelan; (3) an October 5, 2012 written statement of Dustin Lantz; and/or (4) statements made by other Union representatives.

82.   On October 6, 2012, Crismon discussed the CAN with Captain Robert Ziegler, who indicated that the Union was launching yet more investigations in an attempt to effectuate Crismon's termination from Rural Metro.  Ziegler advised Crismon to exercise caution.

83.   On October 6, 2012, Crismon met with Lindquist and discussed his belief

CHELLE & ZOLDAN, PLC

7400 East Pinnacle Peak Rd. Suite 204 Scottsdale, AZ 85255
Tel & Fax: 480.442.3410 – Docketing@Chelle-Zoldan.com

that the Union's investigation into the firearm incident was illegal and/or contrary to the Union's regulations.

84.     Because Crismon lost two shifts, a Rural Metro employee posted on the Company forum a request that other firefighters donate shifts in order for Crismon to recoup lost compensation.

85.     In response, the Union berated that employee on the Company forum, for attempting to aid Crismon, who in their opinion "is probally [sic] not a high priority" because he "dropped out of the Union."

86.     Crismon, however, was always a member of the Union at all relevant times herein.

87.     On or about November 2, 2012, Crismon attended the monthly Union meeting.  When the forum was opened for general conversation to the membership, the topic quickly directed to Crismon, who was openly berated by the Union.  Several members claimed that they could not trust Crismon because he had reported a fellow firefighter for theft, solidifying Crismon's suspicion that the Union had been tormenting him based on his disclosure of Drum's theft nine months earlier.

88.     Shortly thereafter, Crismon approached one of the Union members who had spoken out against him, firefighter John Cooney, in order to alleviate the situation.

89.     Cooney informed Crismon that there was a pact between the Union members not to shake Crismon's hand because he is a "brother fucker."

90.     Engineer Gabe Gutierrez received criticism from Union members for shaking Crismon's hand at the Union meeting earlier in the month.

91.     Immediately after learning this information, Crismon participated in a

CHELLE & ZOLDAN, PLC

7400 East Pinnacle Peak Rd., Suite 204 Scottsdale, AZ 85255
Tel & Fax: 480.442.3410 – Docketing@Chelle-Zoldan.com

meeting with Company HR representatives Tuesday Kramer and Andrea Johnson, Chief Dan Caudle, Chief Wyatt Oden, and Chief Bill Grubb.

92.    During this meeting, the Company acknowledged that the conduct of the Union and most of its members generated an intolerable work environment for Crismon and his crew.   The Company additionally acknowledged that it was under a duty to remedy the situation.

93.    After the meeting, on November 13, 2012, Crismon reduced his concerns in writing and submitted it to the Company, again memorializing his complaints of harassment, hostile work environment, and retaliation.

94.    Instead of addressing and providing a remedy to the substantive issues outlined in Crismon's complaint, the Company opted to re-open its investigation into the firearm incident that had been resolved over a month prior.

95.    The Company claims it re-opened the incident because Whelan complained that the discipline received by Crismon was not severe enough.   Whelan, however, was unable to provide any additional information to his written report received by the Company on October 3, 2012.

96.    Additionally, the Company's decision to re-open its investigation into the firearm incident was allegedly based on a report made by Lou Mirrabelli.

97.    Mirabelli was not present at the time of the incident, and consequently, has no personal knowledge of the facts surrounding the incident.

98.    Notably, Mirrabelli's name appears on the very first page of Crismon's November 13, 2012 complaint as one of the employees/Union members responsible for cultivating Crismon's unbearable work environment.

CHELLE & ZOLDAN, PLC

7400 East Pinnacle Peak Rd., Suite 204 Scottsdale, AZ 85255
Tel & Fax: 480.442.3410 – Docketing@Chelle.Zoldan.com

99.     Upon information and belief, despite having actual knowledge of the extent to which Crismon was being harassed on a daily basis, and that his complaints were indeed legitimate, the Company eagerly resurrected the firearm investigation as pretext to rid itself of the Crismon-situation.

100.     Upon information and belief, all statements that contradicted Crismon's account of the firearm incident were procured by Union members and/or Trustees, including, but not limited to, the Union Trustees identified herein.

101.     Since every complaint Crismon had made himself had fallen upon deaf ears or resulted in retaliation, Crismon enlisted an attorney to demand that Rural Metro cure his work environment pursuant to A.R.S. § 23-1502.

102.     Rural Metro refused to provide a remedy as requested by Crismon, effectively constructively discharging Crismon's employment with the Company.

103.     Following his discharge, Crismon had the *option* of utilizing the Union's grievance procedure as outlined in the CBA.[1]

104.     Because the Union failed to represent Crismon in response to his numerous complaints of harassment, and in fact helped perpetuate the atmosphere of harassment, Crismon understood the grievance procedure to be futile.

105.     On April 8, 2013, Crismon and Rural Metro participated in an Arizona Department of Economic Security Appeal Hearing to determine whether Crismon should receive unemployment benefits as a result of his separation of employment with the Company.

106.     The Hearing lasted over three hours.

---

[1]     Pursuant to the CBA, "[i]n cases involving unlawful discrimination, employment tort violations of public policy or the federal or state statutes, the employee has the option of using the grievance procedure as outlined in this agreement."

107.   Crismon prevailed at the Hearing and was awarded unemployment benefits, in part, because:

> Based upon the facts that the Employer attempted to discharge the claimant several months after the Claimant had already been disciplined *lends credence to the Claimant's allegation that he was subject to retaliation for filing a formal complaint with the human resources department*. Therefore, the Tribunal concludes that the claimant was discharged, but not for willful or negligent misconduct connected with the employment. (emphasis added).

108.   Rural Metro did not appeal Administrative Law Judge L. Knight's decision to award Crismon unemployment benefits.

109.   Despite diligently searching, Crismon has been unable to obtain comparable employment.

## COUNT I
## RETALIATION
## (DEFENDANT RURAL METRO)

110.   Plaintiff reasserts and realleges each and every paragraph, *supra*, as if fully restated herein.

111.   Pursuant to Arizona Revised Statutes section 23-1501, an employee has a claim against an employer for termination of employment if the employer has terminated the employment relationship for reasonable disclosure that the employee believes that another employee is violating the statutes of the State of Arizona.

112.   Plaintiff witnessed an employee of Defendant Rural Metro stealing its property.

113.   Theft is prohibited by Arizona law.

114.   Plaintiff disclosed to Defendant that he witnessed an employee of the Defendant stealing consistent with Company policy.

115. Such disclosure was reasonable.

116. Defendant Rural Metro retaliated against Plaintiff by, *inter alia*, failing to adequately respond to Plaintiff's legitimate complaints and launching unwarranted investigation(s) against Plaintiff.

117. In addition, Plaintiff made numerous reasonable disclosures to the Company that he was being subjected to a hostile work environment and harassment by other Company employees.

118. In response to those complaints, the Company unlawfully retaliated against Crismon and severed his employment.

119. Plaintiff has been damaged in an amount to be proven at trial.

**COUNT II**
**CONSTRUCTIVE DISCHARGE**
**(DEFENDANT RURAL METRO)**

120. Plaintiff reasserts and realleges each and every paragraph, *supra*, as if fully restated herein.

121. An employee suffers from constructive discharge in objectively difficult or unpleasant working conditions to the extent that a reasonable employee would feel compelled to resign. A.R.S. § 23-1502.

122. Defendant generated a manifestly difficult and unpleasant work environment for Plaintiff.

123. Plaintiff felt compelled to resign from Defendant because of the difficult and unpleasant work conditions.

124. A reasonable person in Plaintiff's position would feel compelled to resign when subjected to the same untenable harassment met with repeated inaction.

125.   Defendant terminated Plaintiff's employment relationship by constructively discharging him from the Company.

126.   As a result of the difficult and unpleasant work environment, Plaintiff has been damaged in an amount to be proven at trial.

**COUNT III**
**BREACH OF CONTRACT**
**(RURAL METRO & IAFF LOCAL 3878 CHARITIES)**

127.   Plaintiff reasserts and realleges each and every paragraph, *supra*, as if fully restated herein.

128.   The CBA is an enforceable contract.

129.   The CBA expressly grants contractual rights for the benefit of Rural Metro employees and Union members, which are in addition to those provided by other contract(s) and/or elsewhere under the Arizona Revised statutes or other applicable federal laws and regulations.

130.   Plaintiff was, at all times relevant to this Complaint, a member of the Union and an employee of Rural Metro.

131.   Plaintiff is a party to the CBA.

132.   In the alternative, Plaintiff is a real party in interest and/or a third party beneficiary to the CBA, granting Plaintiff full authority to individually enforce all rights granted thereunder.

133.   Plaintiff has performed his duties and obligations under the CBA.

134.   Defendants have materially breached the express and/or implied contractual obligations owed to Plaintiff as alleged elsewhere herein.

135.   Plaintiff has been substantially and materially harmed by Defendants'

CHELLE & ZOLDAN, PLC
7400 East Pinnacle Peak Rd., Suite 204 Scottsdale, AZ 85255
Tel & Fax: 480.442.3410 – Docketing@Chelle-Zoldan.com

breaches of the CBA.

136.    Plaintiff is entitled to recover damages for all compensatory and special damages caused by or resulting from the Defendants breach of the CBA, including recovery of attorneys' fees and costs.

### COUNT IV
### BREACH OF WARRANTY OF GOOD FAITH AND FAIR DEALING
### (RURAL METRO & IAFF LOCAL 3878 CHARITIES)

137.    Plaintiff reasserts and realleges each and every paragraph, *supra*, as if fully restated herein.

138.    Plaintiff is a party to the CBA.

139.    In the alternative, the class to which Plaintiff belongs and/or Plaintiff is the real party in interest and/or a third party beneficiary to the CBA.

140.    The CBA necessarily, by application of Arizona law, includes an implied covenant of good faith and fair dealing.

141.    The implied warranty of good faith and fair dealing prohibits a party from doing anything to prevent other parties to the contract from receiving benefits and entitlements of the agreement.

142.    Defendants have breached their obligation of good faith and fair dealing and deprived Plaintiff from receiving the benefits and entitlements of the CBA.

143.    Plaintiff has been substantially harmed by Defendants' breach of said warranty, in a sum certain amount to be proved and determined at trial.

### COUNT V
### BREACH OF DUTY OF FAIR REPRESENTATION
### (DEFENDANT IAFF LOCAL 3878 CHARITIES)

144.    Plaintiff reasserts and realleges each and every paragraph, *supra*, as if fully

CHELLE & ZOLDAN, PLC

7400 East Pinnacle Peak Rd. Suite 204 Scottsdale, AZ 85255
Tel & Fax: 480.442.3410 – Docketing@Chelle-Zoldan.com

restated herein.

145.   The duty of fair representation requires a union to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.

146.   A union's duty of fair representation includes the duty to perform some minimal investigation, the thoroughness of which varies with the circumstances of the particular case.

147.   An egregious disregard for union members' rights constitutes a breach of the duty of investigation.

148.   The Union has a duty to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.

149.   The Union did not serve the interests of the Plaintiff without hostility or discrimination.

150.   The Union did not exercise good faith in representing Plaintiff, and wholly failed to represent Plaintiff's interests.

151.   The Union had a duty to investigate Plaintiff's complaints.

152.   The Union did not investigate Plaintiff's legitimate complaints in any manner, and instead perpetuated and condoned its members harassment of Plaintiff.

153.   As a direct and proximate result, Plaintiff's employment relationship with Defendant Rural Metro was severed.

154.   Plaintiff has been damaged in an amount to be proven at trial.

## CONCLUSION AND PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment against Defendant as follows:

CHELLE & ZOLDAN, PLC
7400 East Pinnacle Peak Rd., Suite 204 Scottsdale, AZ 85255
Tel & Fax: 480.442.3410 – Docketing@Chelle-Zoldan.com

A.      An award of damages for all counts in an amount to be proven at trial;

B.      An award of compensatory and punitive damages in an amount to be proven at trial;

C.      Any other remedies or judgments deemed just and equitable by this Court.

**<ins>JURY DEMAND</ins>**

Plaintiff hereby demands a trial by jury of all issues so triable.

RESPECTFULLY SUBMITTED on June 17, 2013.

**CHELLE & ZOLDAN, PLC**

By: <ins>/s/ Michael Zoldan</ins>
7400 E. Pinnacle Peak Rd. Ste. 204
Scottsdale, AZ 85255
Attorneys for Plaintiff John Crismon

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **VERIFICATION**

Plaintiff John Crismon declares under penalty of perjury that he has read the foregoing Verified Complaint and is familiar with the contents thereof.  The matters asserted therein are true and based on his own personal knowledge, except as to those matters stated upon information and belief, and as to those matters, he believes them to be true.

John Crismon

CHELLE & ZOLDAN, PLC

7400 East Pinnacle Peak Rd  Suite 204 Scottsdale, AZ 85255
Tel & Fax  480 442 3410 – Docketing@Chelle-Zoldan com